753 So.2d 683 (2000)
Barrington WILSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D98-3388.
District Court of Appeal of Florida, Third District.
March 15, 2000.
Rehearing Denied April 19, 2000.
*685 Leonard J. Cooperman, Miami, for appellant.
Robert A. Butterworth, Attorney General, and Christine E. Zahralban, Assistant Attorney General, for appellee.
Before GODERICH and SORONDO, JJ., and NESBITT, Senior Judge.
SORONDO, J.
Barrington Wilson, defendant, appeals his convictions and sentence on three counts of armed sexual battery with force, one count of burglary with an assault or battery and one count of robbery with a firearm. Defendant raises five issues on appeal. We find four of them worthy of discussion.
The defendant's first claim is one of ineffective assistance of trial counsel. Although such a claim is cognizable on direct appeal where the right to relief is apparent on the face of the record, see Blanco v. Wainwright, 507 So.2d 1377 (Fla.1987); Caison v. State, 695 So.2d 872 (Fla. 3d DCA 1997), we do not find this to be such a case. As will become apparent from our analysis of the other issues raised, this was an extremely complex case which required numerous strategic decisions on the part of defense counsel. These decisions were made all the more difficult by the defendant's disruptive behavior. Accordingly, we reject the defendant's arguments on this claim of error without prejudice to his pursuing it by way of rule 3.850 of the Florida Rules of Criminal Procedure.
Next, we consider the trial court's refusal to excuse several jurors for cause. We agree with the state that this issue has not been properly preserved for review. In Trotter v. State, 576 So.2d 691 (Fla.1990), the Florida Supreme Court held that in order to properly preserve for review the denial of a challenge for cause the party must do the following:
Under Florida law, "[t]o show reversible error, a defendant must show that all peremptories had been exhausted and that an objectionable juror had to be accepted." Pentecost v. State, 545 So.2d 861, 863 n. 1 (Fla.1989). By this we mean the following. Where a defendant seeks reversal based on a claim that he was wrongfully forced to exhaust his peremptory challenges, he initially must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted.
Id. at 693 (footnotes omitted); Jones v. State, 660 So.2d 291 (Fla. 2d DCA 1995). In this case, the defendant asked for and received two additional peremptory challenges for a total of twelve. When his final request for a third additional peremptory challenge was denied, he did not identify which prospective juror he would excuse if granted the additional strike. This issue was therefore not preserved for review.
Even if the issue had been properly preserved, we find no merit in the defendant's motion to excuse juror Barbosa for causethe juror defendant now asks us to infer his lawyer would have stricken with the requested peremptory challenge. Nor do we find any merit in the defendant's motions to strike prospective jurors Twist and McGuire for cause. As acknowledged by defendant, both of these prospective jurors definitively stated that they could be fair. Having the best vantage point for gauging the veracity of their responses, the trial judge believed them. "[T]he trial court's determination of juror competency will not be overturned absent manifest error." *686 Foster v. State, 679 So.2d 747, 752 (Fla.1996); Mills v. State, 462 So.2d 1075 (Fla.1985). Likewise, we find no merit in the motions to strike prospective jurors Jimenez, Perez, and Vanegas for cause. The Florida Supreme Court addressed a similar issue to that raised by defendant in Cook v. State, 542 So.2d 964 (Fla.1989). The Court stated:
With the large influx of persons of Hispanic origin, it can now be expected that many jury venires in south Florida will contain persons who do not use textbook English grammar. However, it is the ability to understand English rather than to speak it perfectly which is important. After an extensive colloquy, the trial judge was satisfied that [the jurors in question] had an adequate comprehension of English to serve fairly on the jury. We are in no position to say that he was wrong.
Id. at 970 (citation omitted). As in Cook, the trial judge in this case spoke with the prospective jurors and determined that they understood the English language sufficiently well to serve on the jury. On this record, we are not in a position to dispute her conclusions.
We proceed to discuss the defendant's claim that the trial court failed to conduct a proper Faretta[1] hearing when the defendant sought to discharge his court-appointed attorney. Midway through his trial the defendant, for the first time, asked the court to discharge his attorney. The exchange was the following:
DEFENDANT: It's exactly about what I got to talk about, the attorney. I would like [my attorney] dismissed of my case, on various grounds.
COURT: You want him dismissed?
DEFENDANT: Yes.
COURT: And what is it that you are requesting as part of the dismissal?
DEFENDANT: I'm requesting for new counsel.

COURT: Oh, you want another attorney?

DEFENDANT: Yes, ma'am.

COURT: Okay, what is it that [your attorney] is or is not doing, that you would like him dismissed?
DEFENDANT: Your Honor, he hasn't spoken to me about the law, and he just agreed to it, so I prefer that he state his reasons why he feels he should be dismissed off the case.
(Emphasis added). The court then asked defense counsel why he wished to be discharged. Counsel indicated that he was not moving to withdraw but acknowledged that representing his client was a very difficult endeavor and that it appeared that the defendant had lost faith in him. Having heard from both the defendant and counsel, the court concluded that defense counsel's performance had been "not only adequate but exemplary." She indicated that she would not discharge defense counsel.
Consistent with his behavior throughout the trial, the defendant refused to remain silent after the trial judge's rulings and added the following:
DEFENDANT: [My lawyer], since he was appointed as my counsel, he has only come to see me twice, in this period of time.
And every visit, he has never told me defense strategy, or anything at all, except that he thinks that I'm stuck, he says, in the place where they got me situated.
He already tells me, that he was going to lose this case, you know, from the beginning.
The defendant then embarked on a prolonged narrative wherein he accused his lawyer of saying that he (counsel) was not making enough money to represent defendant adequately; that the judge and the prosecutor were involved in a conspiracy against defendant; that he (defendant) was, in fact, guilty, and that counsel would *687 put money into the defendant's commissary account if the defendant would plead guilty. Counsel was given an opportunity to respond and he denied the allegations. He conceded that he had offered to make a deposit into the defendant's commissary account but not as a condition of a plea. He further agreed that he had told defendant that he was extremely busy and consequently could not visit the jail as often as defendant would like but that he was preparing the case for trial.[2] Finally, he suggested to the court that he had communicated to defendant the difficulties of the case from the defense perspective.[3]
We begin by noting that the trial judge was not obligated to conduct a Nelson inquiry in this situation. In Haugabook v. State, 689 So.2d 1245 (Fla. 4th DCA 1997), the Fourth District Court of Appeal concurred with the Second District Court of Appeal's decision in Dukes v. State, 503 So.2d 455 (Fla. 2d DCA 1987), and held that a Nelson inquiry need not be conducted when the motion to discharge counsel is made only after the trial has begun. This Court reached the same conclusion in Harris v. State, 747 So.2d 1070 (Fla. 3d DCA 2000).
Regardless of this, in what appears to have been an abundance of caution, the trial court conducted the inquiry. After hearing from both the defendant and his attorney a second time on this same issue, the court again denied the request to discharge counsel. The defendant now argues that he is entitled to a reversal of his conviction because the trial judge failed to conduct a proper Faretta hearing.
In Howell v. State, 707 So.2d 674 (Fla.), cert. denied, 524 U.S. 958, 118 S.Ct. 2381, 141 L.Ed.2d 747 (1998), the Supreme Court of Florida held:
In Hardwick v. State, 521 So.2d 1071 (Fla.1988), this Court adopted the procedure announced in Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), to be followed when a defendant complains that his appointed counsel is providing him with ineffective representation. When this occurs, the trial judge is required to make a sufficient inquiry of the defendant to determine whether or not appointed counsel is rendering effective assistance to the defendant. However, the trial judge's inquiry can only be as specific as the defendant's complaint. Lowe v. State, 650 So.2d 969 (Fla.1994). Here, the trial court made an adequate inquiry into Howell's complaints of ineffectiveness and properly determined them to be without merit. Because Howell never requested to represent himself, he was not entitled to an inquiry on the subject of self-representation under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Id. at 680 (emphasis added). As in Howell, the judge in this case conducted the correct, albeit unnecessary, inquiry and concluded that defense counsel's performance was "not only adequate but exemplary." As in Howell, the defendant in this case never asked to represent himself, indeed he specifically requested the appointment of another attorney. Consequently, the trial judge was not required to conduct a Faretta inquiry. We find no *688 error in the lower court's rulings on these issues.
The defendant incorporates into his Faretta argument the fact that on several occasions during trial defense counsel moved to withdraw from the case, claiming that his relationship with the defendant was deteriorating. Counsel told the judge that defendant had accused him of professional misconduct and indicated that a Florida Bar complaint would be filed. These motions to withdraw have nothing to do with the Faretta issue. At no time during the trial did the defendant indicate he wished to represent himself.
As concerns the motions to withdraw, this Court has previously stated that:
[T]rial courts are given broad discretion to determine whether a motion to withdraw should be granted.... The primary responsibility of the court is to facilitate the orderly administration of justice. In making the decision of whether to grant counsel permission to withdraw, the trial court must balance the need for orderly administration of justice with the fact that an irreconcilable conflict exists between counsel and the accused. In doing so the court must consider the timing of the motion, the inconvenience to the witnesses, the period of time elapsed between the date of the alleged offense and trial, and the possibility that any new counsel will be confronted with the same conflict. As long as the trial court has a reasonable basis for believing that the attorney-client relation has not deteriorated to a point where counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in denying a motion to withdraw. The decision of a trial court to deny a motion to withdraw will not be disturbed absent a clear abuse of discretion.
Sanborn v. State, 474 So.2d 309, 314 (Fla. 3d DCA 1985) (citations omitted). See also Thomas v. State, 725 So.2d 1171 (Fla. 5th DCA 1998), review granted, 744 So.2d 459 (Fla.1999); Beatty v. State, 606 So.2d 453 (Fla. 4th DCA 1992). Counsel's motion to withdraw in this case was made in the middle of a jury trial in a two-year-old case. Granting the motion would have required the declaration of a mistrial and the rescheduling of trial a significant amount of time later to allow a newly appointed attorney to adequately prepare. The victim, who had already testified, was more than ninety-years-old and might not have been available for the next trial. Perhaps most significant is the fact that this was not the defendant's first defense attorney. In light of the defendant's constant efforts to obstruct the progress of the trial, there is no reason to believe that his relationship with a newly-appointed lawyer would have been any better. See Weems v. State, 645 So.2d 1098 (Fla. 4th DCA 1994). Finally, counsel's stated reasons for wishing to withdraw were the defendant's loss of confidence in counsel's ability to deliver effective assistance during the trial, defendant's threat to file a bar complaint as a result of the ineffectiveness, and defendant's refusal to cooperate with counsel in the presentation of the defense. As concerns the defendant's recurring claim of ineffectiveness, we note that within the context of the Nelson inquiry the trial judge had already determined that defense counsel's performance at trial had been "exemplary." As concerns the other claim, in Johnston v. State, 497 So.2d 863 (Fla.1986), the Florida Supreme Court stated that a generalized loss of confidence or lack of cooperation alone is insufficient to mandate withdrawal by counsel. Additionally, counsel cannot withdraw from a case merely because his client refuses to follow his advice, a complaint which we infer from counsel's statements to the court. "Were we to hold otherwise, the floodgates would open, and substitution of counsel would be warranted in an untold number of cases." Id. at 868. On the record before us we cannot conclude that the trial judge abused her discretion in denying the motions to withdraw. Moreover, *689 it is implicit in the trial judge's rulings on these motions that the animosity between counsel and the defendant was yet another effort by the defendant to sabotage the trial of the charges against him.
Finally, in what can only be described as an attempt to expand the parameters of the Yiddish word "chutzpah," the defendant argues that the trial judge erred by repeatedly excluding him from the courtroom during the course of his trial. We disagree.
In order to fully understand the circumstances under which the trial judge was operating it is necessary to briefly review the facts of the case and the circumstances under which it was tried. The charges against the defendant arose from a brutal sexual attack on a ninety-year-old woman. In April of 1996, the trial court ruled that the defendant was incompetent to proceed to trial. In October of the same year, a second competency hearing was conducted and the defendant was found to be competent to proceed to trial.
The defendant went to trial on his first case, a very similar sexual battery on another elderly woman, in September of 1997. During that trial the defendant unsuccessfully raised the defense of insanity. Throughout that proceeding he acted in a very bizarre manner, at one point jumping over counsel table, picking up a chair and hurling it at the prosecutor.[4] The judge immediately ordered an emergency psychiatric examination which concluded that the defendant was competent to proceed. The examining psychologist testified that the defendant's outbursts were exaggerated and feigned.[5]
In June of 1998, the defendant filed a pleading entitled "Notice of Intent to Rely on Insanity Defense and/or Notice of Defendant's Incompetence to Stand Trial." In September of that year, a third competency hearing was conducted.[6] At this hearing the court heard testimony from both expert and lay witnesses concerning the defendant's mental status. The trial court ultimately believed the testimony from the doctors who testified that the defendant was malingering, and the testimony of the officers from the Department of Corrections who testified that contrary to his courtroom behavior, the defendant's behavior in the jail was perfectly normal.
During the trial of this case, the defendant's behavior was as disruptive, if not more so, than it had been at his first trial. His obstructive behavior began during a pre-trial hearing and continued throughout the trial.[7] On numerous occasions he was so loud and disruptive that the trial judge was compelled to have him removed from the courtroom. When removed from the courtroom, the defendant would be held in a holding cell which adjoins the courtroom. At one point, the defendant was screaming so loudly in his cell that a neighboring circuit judge was forced to recess his own trial and approach the judge in this case to request that she order the defendant moved elsewhere, as it was impossible to *690 conduct a trial in the adjoining courtroom because of the noise.
The United States Supreme Court has explained the need to balance the integrity of the court system and the need to effectively handle the disruptive defendant as follows:
It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant...:(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.
Illinois v. Allen, 397 U.S. 337, 343-44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). See also Knight v. State, 746 So.2d 423, 432 (Fla.1998); Valdes v. State, 626 So.2d 1316, 1321 (Fla.1993). The trial judge availed herself of the last of these "constitutionally permissible" alternatives. Although defense counsel suggested the possibility of gagging the defendant, this was not a good idea. Binding and gagging a defendant who yields to the procedure is a simple task. Doing the same to a reluctant, violent defendant can prove to be a hazardous task for the correctional officers who must perform the job. This defendant had repeatedly demonstrated his unwillingness to cooperate in any way. Additionally, during his previous trial he had become violent and attacked the prosecutor. The judge's decision not to use this option, due to the obvious fear that violence might ensue, is understandable.
The second option, a contempt citation which carries a potential maximum sentence of 180 days in the county jail, is woefully inadequate where, as here, the defendant has already been convicted of a life felony and is on trial for additional, multiple life felonies. The trial judge's decision to remove the defendant from the courtroom was therefore eminently reasonable.
We note further that the judge arranged for a closed circuit television system to be set up so that the defendant could watch the trial proceedings from his holding cell. Moreover, although she was repeatedly forced to remove the defendant from the courtroom, she repeatedly offered him the opportunity to participate if he would behave. The defendant voluntarily chose not to be present during his trial by continuously trying to disrupt its progress.
We commend the trial judge for the remarkable patience she demonstrated during this very difficult case, and for her extensive efforts to ensure this most recalcitrant defendant a fair trial.
We reject the defendant's remaining claim of error.
Affirmed.
NOTES
[1] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[2] As concerns the sufficiency of the defendant's grievance in this context, we note that a complaint based on inadequate conferences with counsel, without a more specific claim of incompetence, does not require a full Nelson inquiry. See Augsberger v. State, 655 So.2d 1202 (Fla. 2d DCA 1995); Lee v. State, 641 So.2d 164 (Fla. 1st DCA 1994); Kenney v. State, 611 So.2d 575 (Fla. 1st DCA 1992); Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).
[3] The evidence against the defendant was considerable. The attending physician at the rape treatment center testified that a gynecological examination of the 90-year-old victim showed signs of digital penetration of the victim's vagina as well as signs that the victim was tied up and otherwise bruised. Additionally, the victim positively identified the defendant and the police collected samples from the victim's bed, where the sexual assault occurred, which matched the defendant's DNA.
[4] At another point in that trial the defendant managed to smuggle a bag containing his own feces into the courtroom and hurled it at the judge. Mercifully, he missed.
[5] We take judicial notice of our own file in Wilson v. State, case number 97-3402. See § 90.202(6), Fla. Stat. (1999).
[6] The record is not clear as to whether this was the second or third "hearing" on the subject of the defendant's competency. It appears possible that the trial court's initial finding of incompetency was based on a stipulation by the parties that the mental health professionals who examined the defendant would testify consistently with their written reports. Nevertheless, this was the third time the court formally addressed the defendant's competency to stand trial.
[7] For example, throughout the trial court's Nelson inquiry and the defendant's lengthy narrative in response thereto, the defendant was very clear and lucid. When the court ruled against him, the defendant immediately threatened to swallow a razor blade and again disrupted the proceedings.